RECEIVED
IN LAKE CHARLES, LA.
DEC 10 2015
TONY R. MOORE, CLERK
BY_____ DEPUTY

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| ROBERT DePERRODIL | * | CIVIL ACTION NO. 6:13-cv-849 |
| v. | * | JUDGE MINALDI |
| BOZOVIC MARINE, INC | * | MAGISTRATE JUDGE HANNA |

## OPINION

The plaintiff, Robert dePerrodil ("dePerrodil"), brought this lawsuit against Bozovic Marine, Inc. ("Bozovic Marine"), and Clayton Williams Energy, Inc.,[1] pursuant to this court's admiralty jurisdiction under 28 U.S.C. § 1333. dePerrodil alleged that negligence on the part of Bozovic Marine and its principals, agents, servants, and employees caused his injuries on November 13, 2012.[2]

This court presided over a bench trial commencing on May 18, 2015. Both dePerrodil and Bozovic Marine have filed post-trial briefs (Rec. Docs. 98 & 99, respectively). Having carefully considered the evidence presented at trial and the arguments of the parties, the court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the court hereby adopts it as such.

## FINDINGS OF FACT

On November 13, 2012, dePerrodil was assigned to oversee a rigless workover at the Main Pass 48 platform, a production platform six miles outside of the mouth of the Baptiste Collete Canal in the Gulf of Mexico, as a part of his duties as a consultant for Petroleum Engineers, Inc. ("PEI"). To get to the platform, it was necessary for dePerrodil to be transported

---

[1] Clayton Williams Energy, Inc., was dismissed as a party on March 5, 2015. *See* Order (Rec. Doc. 62).
[2] *See* Compl. (Rec. Doc. 1) ¶¶ 4-21.

1

via crew boat. Captain Petar Bozovic of Bozovic Marine was hired to transport dePerrodil on the M/V THUNDER STAR and provided with the name and location of the Main Pass 48 platform. The lift boat for the platform was not visible when Captain Bozovic exited the mouth of the Baptiste Collete Canal, but the *M/V THUNDER STAR* still proceeded into the Gulf of Mexico. Captain Bozovic never attempted to hail the lift boat to identify its location. When Captain Bozovic was unable to locate the lift boat after coming within one mile of its expected location, the *M/V THUNDER STAR* turned around and headed back toward port.

Captain Bozovic testified that at no point in time prior to or during the voyage of November 13, 2012, did he check the NOAA weather reports or use either of the two VHF radios aboard his vessel to identify the weather or sea conditions. Nonetheless, Captain Bozovic testified that given the weather and sea conditions, he knew it would be "rough" heading back into the Venice marina.

While returning to the Baptiste Collette waterway, during which time dePerrodil was in the wheelhouse, Captain Bozovic testified that he operated the *M/V THUNDER STAR* at full throttle as the vessel climbed the crests of the waves, and then pulled back the clutch as it fell into the troughs of the waves. Captain Bozovic continued with his erratic operation of the *M/V THUNDER STAR* for approximately ten minutes, until the vessel encountered a larger wave. The larger wave which impacted the *M/V THUNDER STAR* was approximately eight-to-ten feet in height. Although he saw the roughly eight-foot wave prior to the impact with the *M/V THUNDER STAR*, Captain Bozovic testified that he never warned dePerrodil or Mr. Barry Daniel Sobel, the deckhand, of the incoming wave. The testimony by the parties identifies that Captain Bozovic left the *M/V THUNDER STAR* in full throttle as the larger wave impacted the port broadside of the vessel.

Captain Bozovic testified that before the accident, there was nothing that would have prevented him from idling back to shore. The plaintiff's marine operations expert, Captain Richard Frenzel, testified that by running the *M/V THUNDER STAR* at full speed and then reducing speed between waves, all while being struck broad side by waves, Captain Bozovic created and contributed to the inability of dePerrodil to retain his balance, grasp and footing prior to being thrown on the wheelhouse floor. Captain Frenzel further testified that Captain Bozovic had the option to run weather patterns while in route to the Baptiste Collette Canal, or to reduce the vessel's speed until he entered calmer waters; however, he failed to take any such actions.

Captain Bozovic neither instructed dePerrodil to leave the wheelhouse nor to sit in the passenger compartment. As the *M/V THUNDER STAR* fell into the trough of the larger wave, dePerrodil felt weightless until the vessel impacted the base of the trough of that wave. The impact caused dePerrodil to lose his hand hold and knocked him into a sitting position on the bench that was immediately behind him, and then to the deck of the M/V THUNDER STAR. While dePerrodil was lying on the floor, Sobel offered to help him up, but because of the severity of dePerrodil's injuries, he could not move from his position.

As a result of this accident and his related injuries, dePerrodil has not returned to any form of employment. Additionally, treatment of the injuries will require future surgery.

## CONCLUSIONS OF LAW

### I. Jurisdiction

This court has jurisdiction pursuant to 28 U.S.C. § 1333.

### II. Negligence of Bozovic Marine

The plaintiff contends that the *M/V THUNDER STAR* was traveling too quickly for the prevailing sea conditions and small size of the vessel. He additionally asserts that Captain

Bozovic was negligent in attempting to enter the Gulf of Mexico when he knew or should have known that it was unsafe and dangerous to his passengers

Analysis of maritime tort cases relies on general principles of negligence law. *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980); *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985)). A plaintiff is required to show: (1) duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) causation; and (4) damages. *Id.* (citing *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).

I.  **Duty**

Whether a defendant owes a plaintiff a legal duty is a question of law. *Id.* (citations omitted). In admiralty, duty may arise from three sources: (1) duly enacted laws, regulations, and rules; (2) custom; and (3) the dictates of reasonableness and prudence. *Penn. R.R. Co. v. S.S. Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962), *aff'd*, 320 F.2d 262 (3d Cir. 1963). In determining the existence of a duty, the following factors must be examined and weighed: (1) probability of accident, (2) potential extent of injury, and (3) cost of adequate protections. *See* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-2 (5th ed. 2014). The carrier has a duty to warn passengers of reasonably anticipated dangers—though not openly obvious ones. *Counts v. Lafayette Crewboats, Inc.*, 622 F. Supp. 299, 301 (W.D. La. 1983) (collecting cases). A vessel owner is not the absolute insurer of the passenger's safety, so if the passenger is injured absent owner negligence, no recovery is mandated. *Id.*

In 1959, the Supreme Court of the United States addressed the standard of care owed by an owner to those on board a ship and stated that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising

reasonable care under the circumstances of each case." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959). The Fifth Circuit acknowledged the different standards of care that had been applied and paraphrased in different ways in the wake of *Kermarec* but reaffirmed that a shipowner owes the duty of exercising "reasonable care under the circumstances of each case." *Smith v. So. Gulf Marine Co., No. 2, Inc.*, 791 F.2d 416, 421 (5th Cir. 1986) (citing *Kermarec*, 358 U.S. at 632). The circumstances may include (1) experience of the crew, (2) the type of carrier involved, (3) the dangers to the passengers peculiar to that type of carrier, (4) the carrier's degree of control over the passengers, and (5) the carrier's ability to take precautions against such dangers. *Id.*

Captain Bozovic had over twenty years of experience operating crew boats in Louisiana waters. With only the plaintiff as a passenger on board, Captain Bozovic would have been able to exert a high degree of control over him. Additionally, there were many opportunities for Captain Bozovic to take precautions under the circumstances, including checking the weather and sea conditions, requesting that dePerrodil sit in the passenger compartment, and reducing speed in inclement weather.

The weather conditions on the day of the accident were not so "openly obvious" as to relieve Captain Bozovic of his duty to dePerrodil. *See Counts*, 622 F. Supp. at 301. It is true that no recovery is mandated in the absence of owner negligence. *Id.* However, inclement weather does not absolve a captain from operating his vessel in a reasonably prudent manner. The weather conditions were not so severe as to make dePerrodil's injuries unavoidable nor to put dePerrodil on notice that he was in imminent danger.

Captain Bozovic, as the master of the *M/V THUNDER STAR,* was completely responsible for every action of his vessel, including all navigational decisions, operational decisions, and

passenger placement, as well as safety rules. Specifically, Captain Bozovic had a duty to operate his vessel in a safe manner, to make sure that his passengers were safely positioned while the vessel was underway, and to be fully apprised of the deteriorating weather conditions for the voyage at hand.

## II.     Breach

A defendant's failure to warn the plaintiff is a breach of the duty of care when the resultant harm is reasonably foreseeable. *Daigle*, 616 F.2d at 827. Bozovic Marine, through the actions and/or inactions of Captain Bozovic, breached its duty of reasonable care owed to dePerrodil under the circumstances. Captain Bozovic breached his duty of reasonable care when he failed to request that dePerrodil go to the passenger area of the vessel, in disregard of Bozovic Marine's own safety policy, where the ride would be smoother and safer. The court agrees with Captain Frenzel that the *M/V THUNDER STAR* was not designed or built to carry passengers in the pilot house while underway, as there were no safe seating arrangements or hand holds for anyone besides the vessel operator.

As Captain Frenzel testified, Captain Bozovic breached his duty to take appropriate action to stay apprised of relevant weather conditions. Captain Bozovic neither checked the NOAA Maritime weather forecast the evening before the trip, nor verified the weather and sea conditions on the NOAA Weather Radio prior to leaving the dock. Despite being uncertain whether the lift boat was in the same area as the Main Pass 48 platform, Captain Bozovic entered the Gulf waters with knowledge that a return trip would be rough. While returning to the Baptiste Collette Canal, Captain Bozovic failed to run weather patterns

Furthermore, Captain Bozovic's erratic operation of the *M/V THUNDER STAR* at full speed and then pulling back to clutch speed between seas, all while being struck broad side by

the six-foot-plus seas, and ultimately cresting an eight-foot wave at full throttle, caused dePerrodil to be thrown on the wheelhouse floor. Captain Bozovic breached his duty of reasonable care when he failed to reduce the vessel's speed or idle the vessel until it entered the calm waters of the Baptiste Collette Canal. Thus, Bozovic Marine, through the actions and/or inactions of Captain Petar Bozovic, was negligent, and that negligence led directly and proximately to the incident and dePerrodil's injuries.

### III. Causation

Causation in admiralty, with the exception of certain specialized causes of action, is the same as in common law. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-3. There are two components: (1) factual causation, using either the "but for" test or "substantial factor" test; and (2) proximate causation. *Id.* Captain Bozovic's failure to apprise himself of weather conditions, neglect to tell dePerrodil to exit the wheelhouse and enter the passenger compartment, and erratic operation of the *M/V THUNDER STAR* were the factual and proximate causes of the injuries dePerrodil suffered when thrown to the wheelhouse floor.

Additionally, the plaintiff has satisfied his burden of causation with regard to both his low back injuries and hand injury. PEI hired dePerrodil in 2010, and dePerrodil appears to have been capable of performing all his duties prior to the accident on November 13, 2012. Following the accident, dePerrodil suffered from injuries severe enough to require surgery, and which affected his ability to perform his duties. Considering the facts and the testimony of the medical experts, the plaintiff has satisfied his burden of medical causation under General Maritime Law.

### IV. Damages

Liability in maritime causes of action is to be apportioned on the basis of comparative fault. *Pennzoil Prod. Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1474 (5th Cir. 1991) (citing

*United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975)). A failure to reasonably safeguard one's own person or property constitutes fault. *S.C. Loveland, Inc. v. E. W. Towing, Inc.*, 608 F.2d 160, 166 (5th Cir. 1979). A plaintiff with an otherwise valid right of action is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them. *Pennzoil*, 943 F.2d at 1474 (quoting *Southport Transit Co. v. Avondale Marine Ways, Inc.*, 234 F.2d 947, 952 (5th Cir. 1956)); *see also Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989).

The court finds dePerrodil was partly at fault for his injuries. The plaintiff was negligent for staying in the wheelhouse instead of going to the passenger compartment below as the sea conditions deteriorated, even if Captain Bozovic never instructed him to do so. Thus, dePerrodil bears comparative fault in this matter. Fault is apportioned 90 percent to Bozovic Marine, and 10 percent to dePerrodil.

### A. Collateral Source Rule

"The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor." *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994). "[W]hen an employee has bargained for a fringe benefit as additional consideration for employment, compensation received by the employee under that fringe benefit should not be deducted from damages awarded to the employee as a result of the employer's negligence." *Id.* at 1244 (citation omitted). "A majority of state courts addressing the matter hold the collateral-source rule prohibits in *tort actions* a reduction of compensatory damages by the difference between the amount billed for medical services and the amount paid." *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373,

381 (5th Cir. 2012) (emphasis in original). As the Fifth Circuit explicitly reasoned in *Manderson*, maintenance and cure is distinguishable from the collateral source rule because maintenance and cure is "not predicated on the fault of the shipowner."[3] *Id.* (citation omitted).

The general principles of the Collateral Source Doctrine clearly apply to this situation. There is no question that the LHWCA obligation met by PEI through its carrier, Liberty Insurance Company, is collateral to the liability of Bozovic Marine. Based upon traditional principles of Maritime Law, the LHWCA obligation met by PEI in this instance is a benefit that the complainant has received by operation of his employment with the LHWCA employer. In essence, dePerrodil provided work for PEI, in exchange for rights granted under General Maritime Law and the LHWCA. Of these rights, he is to be compensated through LHWCA benefits for medical payments for injuries sustained while in service of his employment with PEI. Thus, while complainant did not pay money for a fringe benefit, he clearly provided his work services as a benefit to his employer, in exchange for those rights provided as a matter of law. For this reason, Bozovic Marine is not allowed to take advantage of the LHWCA cure obligation met by PEI and offset it against the amount of medical bills actually charged.

B. *Write-Offs*

A plaintiff cannot recover economic damages for medical fees that the provider is precluded, either by agreement or by law, from collecting from the employer. *See Sanchez v. Brooke* (2012) 204 Cal. App. 4th 126, 141-42 (applying California law); *Terrell v. Nanda*, 33,242 (La. App. 2 Cir. 5/10/00); 759 So.2d 1026, 1031 (holding that plaintiffs may not recover as damages the amounts "written-off" or "contractually adjusted" pursuant to the requirements of the Medicaid program).

---

[3] *Manderson* is also factually distinguishable because the dispute in that case was between employee and employer, not employee and a third party, and was also not addressed in the context of tort. *See* 666 F.3d at 382.

9

### C. *Economic Loss*

The plaintiff can only recover those elements that he can prove with reasonable certainty. The burden of proof is upon the party claiming damage to prove that he has suffered damage and to prove the elements thereof with reasonable certainty. *Peters v. Lines*, 275 F.2d 919, 930 (9th Cir. 1960). Any claim by a plaintiff for lost wages, medical expenses, and impaired future earning capacity must be supported by concrete evidence, not merely an optimistic forecast of loss divorced from the plaintiff's past history, and must be substantiated by the facts. *Fleming v. Am. Exp. Isbrandtsen Lines, Inc.*, 318 F. Supp. 194 (S.D.N.Y. 1970), *aff'd*, 451 F. 2d 1329 (2nd Cir. 1971). An award for loss of future earnings must be based on actual proof of the amount of impairment and not mere conjecture. *Oregon-Washington R.R. & Nav. Co. v. Branham*, 259 F. 555, 557 (9th Cir. 1919); *Fifth v. United States*, 554 F. 2d 990 (9th Cir. 1977). An award for lost income, both past and future, is discounted to reflect lost wage income after both state and federal taxes have been deducted. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536 (1983). Similarly, any award for future benefits, including future lost wages, and future medical care, if any, must be discounted to present value. *Id.* at 538; *Alma v. Mfrs. Hanover Trust Co.*, 684 F.2d 622, 626 (9th Cir. 1982).

The court accepts the reports of Ms. Stephanie Chalfin, a professional vocational rehabilitation counselor and certified life care planner. Ms. Chalfin evaluated the plaintiff on two occasions, the first being November 10, 2013, and the second being December 16, 2014. At the time of her evaluations, Ms. Chalfin had been provided a detailed medical history, medical records, work history, earnings records, and future medical recommendations with respect to the plaintiff.

Ms. Chalfin testified that she inquired into dePerrodil's future employability and that he reported that prior to the accident his goal was to work until age seventy-five (75). When considering this information, Ms. Chalfin concluded that the plaintiff's prognosis for re-employment is not very optimistic due to his physical restrictions, medications, chronic pain, labor market of residence, work history, lack of education, age, and the need for future medical treatment. The court accepts the testimony of Ms. Chalfin that there is no stable labor market readily available to the plaintiff in light of his residual limitations.

The court also accepts the calculations provided by G. Randolph Rice, Ph.D., dePerrodil's expert economist. Using the conclusions of Ms. Chalfin as well as independent calculations, Dr. Rice put the plaintiff's economic loss into two specific periods: past wage losses and future wage losses. With respect to past wage losses prior to the date of trial, Dr. Rice calculates this figure to be $105,635. With respect to future wage losses, Dr. Rice offered two present value figures based on separate scenarios. First, Dr. Rice followed the age found in the Bureau of Labor Statistics, seventy-two (72), and identified dePerrodil's future work life expectancy from the date of trial as 2.09 years. Using that figure, Dr. Rice found the present value of dePerrodil's future after tax earning capacity to be $85,839.

Second, Dr. Rice calculated dePerrodil's future earning capacity in consideration of his personal plan to work until his 75th birthday, or plus 5.53 years from the May 18, 2015 trial date. Dr. Rice calculated the present value of the future after tax earning capacity to be $223,323. The court finds that the second figure, based on a work life expectancy of 75 years, is the appropriate amount to award dePerrodil.

The Court accepts in its entirety the opinions and testimony of Dr. Rice, and hereby finds that the plaintiff sustained total economic losses of $328,958.00 as a direct result of the incident of November 13, 2012, and his resulting injuries.

*D. Past and Future Medical*

With the exception of awards for future pain and suffering, future losses must be discounted to present value. Further, a judgment for future lost income must reflect net after tax value. *Blaauw v. Superior Offshore Int'l, LLC*, No. 06-1380, 2008 WL 4224808, at *14 (W.D. La. Sept. 10, 2008). Future medical expenses are estimated on the basis of medical testimony. *Baham v. Nabors Drilling USA, LP*, 721 F. Supp. 2d 499, 515 (W.D. La. 2010). "An award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability to engage in those activities which normally contribute to the enjoyment of life." *Blaauw*, 2008 WL 4224808, at *15 (citing THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW §§ 5-15.3, 6-18.4 (4th ed. 2004)). Such damages are not susceptible to precise measurement. "Any amount to be awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the reasonable amount needed to achieve full compensation." *Id.* (citing *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir. 1983)).

The plaintiff sustained a lower back injury and a left hand injury on November 13, 2012, while being transported as a passenger aboard the *M/V THUNDER STAR*. Subsequently, Dr. Neil Romero examined the plaintiff and diagnosed the lumbar disc injuries, and recommended surgery in the form of an anterior lumbar fusion, facetectomy, foraminotomy and discectomy at L3-4. The plaintiff also presented the testimony of two IME physicians: Dr. Joe Morgan, an

orthopedist, and Dr. Ricardo Leoni, a neurosurgeon, who both concurred completely with the opinion and recommendation for surgery by Dr. Romero.

The only medical evidence offered by Bozovic Marine in an attempt to refute the testimony of Dr. Romero, Dr. Leoni, and Dr. Morgan, and the medical necessity of these procedures, or their causal connection to the incident of November 13, 2012, was a 2009 CT Report. That 2009 CT report was discussed in detail in Dr. John Martin's deposition testimony, who unequivocally confirmed that the complainant did not have a symptomatic radicular disc herniation until after the November 13, 2012 accident. Moreover, Dr. Romero testified that based on his review of the November 2013 MRI films, it was his expert medical opinion that the L3-4 injury was an "acute" injury sustained as a result of the subject accident.

The court accepts the life care plan prepared by Ms. Chalfin for dePerrodil, which is based on Dr. Scott Gammel's expert medical opinion and recommendation for another radiofrequency ablation within the next six months and dePerrodil's need for a radiofrequency ablation on an annual basis thereafter. Ms. Chalfin's life care plan included follow-up visits with pain management two to four times a year at a cost of $135.00 per visit, as well as the cost of the lumbar radiofrequency ablation to be repeated within six months of April 1, 2015, and then to be repeated annually at a cost of $15,091.96 per procedure.

The court also accepts the future medical calculations provided by Dr. Rice. Based upon the life care plan of Ms. Chalfin and his calculations, Dr. Rice put the plaintiff's future medical expenses at a cost of $226,742.00 to $230,727.00. The court accepts in its entirety the opinions and testimony of Dr. Rice, and hereby finds that the plaintiff sustained total future medical expenses of $228,734.50, the average of Dr. Rice's two figures, as a direct result of the injury-causing incident of November 13, 2012.

Having considered the testimony of the witnesses, experts and medical records, the court finds that the plaintiff's injuries arose out of and were caused by the incident on November 13, 2012, and the treatment undergone and the treatment being recommended to date is both reasonable and medically necessary. The plaintiff's related medical expenses to date total $186,080.30, and the future treatment expenses determined by the court based on Dr. Rice's figures total $228,734.50. The court hereby awards these amounts to the plaintiff as past and future medical expenses, in the total amount of $414,814.80.

E. *General Damages*

The court finds that dePerrodil sustained serious injuries to his lower back and lumbar spine. The evidence presented by both dePerrodil and his treating physicians confirms the difficulties in daily living, the loss of enjoyment of life, both past and future physical pain and suffering, and mental and emotional anguish for injuries resulting from Bozovic Marine's negligence. Because of the injuries suffered, including the surgery and the numerous diagnostic exams, the need for extensive future medical treatment, and the prolonged and lasting impact upon his mind and body, the plaintiff should be awarded $350,000.00 in general damages for his past and future physical and mental pain, suffering, and disability. This award is in line with similar awards made in cases by both United States District Courts and Louisiana State Courts.

F. *Prejudgment Interest*

The court is authorized to award prejudgment interest in cases arising under admiralty jurisdiction. In this circuit, there is a strong presumption in favor of awarding prejudgment interest, and it will usually only be denied in cases where the plaintiff exercised undue delay in bringing his action. *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717, 732 (E.D. La. 2004) (citing *United States v. Ocean Bulk Ships Inc.*, 248 F.3d 331, 344 (5th Cir. 2001)). The

court finds that the plaintiff did not unreasonably delay in bringing the suit. Thus, the court holds that the plaintiff is entitled to prejudgment interest on all monetary sums awarded from the date of loss in the matter, November 13, 2012, at the judicial interest rate on the date of judgment. *See* 28 U.S.C. § 1961.

## CONCLUSION

Based upon the above and foregoing, the court finds in favor of the plaintiff, Robert dePerrodil, and against the defendant, Bozovic Marine, Inc., in the amount of $984,395.52[4] plus judicial interest from November 13, 2012.

Lake Charles, Louisiana, this 3 day of Dec, 2015.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[4] Ninety percent of the sum of the total economic losses ($328,958.00), past and future medical expenses ($414,814.80), and general damages ($350,000).